IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RUSSELL PAIGE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-087-SLR |
| | ) | |
| MBNA AMERICA BANK NA, WILLIAM | ) | |
| CHRISTIE, BRETT SMITH, DAVE DIZIO, | ) | |
| JOHNNI CHURCHMAN, and STEPHANIE | ) | |
| SOER, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT PRETRIAL STIPULATION AND ORDER

**(1)    A statement of the nature of the action, the pleadings in which the issues are raised and whether counterclaims, cross-claims, etc., are involved.**

**Plaintiff's Statement:**

Plaintiff in this action is Russell Paige Smith.  Plaintiff is represented by Adrian J. Moody, Esquire and Stacy L. Shields, Esquire of the Law Offices of Adrian J. Moody, P.C.  Plaintiff's local Counsel is Matthew Fogg, Esquire.   This is a claim under Title 7 of the Employment Law and Section 1981 of the Civil Right s Act.

**Defendants' Statement:**

Plaintiff, Russell Paige Smith, has filed suit against his former employer, MBNA America Bank, N.A., and several persons to whom he reported while employed by MBNA.  MBNA has since merged with Bank of America and defendants William

Christie, Brett Smith and Johnni (the correct spelling is "Jonni") Churchman are no longer employed by the bank.

The suit claims Smith was subjected to race discrimination and retaliation. Smith filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission on May 14, 2003[*] and on September 8, 2005 the EEOC issued a "no cause" finding. This lawsuit was filed on December 5, 2005. The suit was first filed in the Eastern District of Pennsylvania, where Smith resides, but after Defendants moved to transfer, the Plaintiff agreed to transfer the case to this Court. There are no counterclaims or cross-claims.

> **(2)    The constitutional or statutory basis of Federal jurisdiction, together with a brief statement of the facts supporting such jurisdiction.**

Jurisdiction is admitted.

> **(3)    The following facts are not disputed or have been agreed to or stipulated to by the parties:**

Plaintiff was hired by MBNA on June 24, 1996.

Plaintiff has sickle cell anemia, and was out of work on FMLA or STD leave periodically due to his sickle cell anemia, as well as for other reasons.

In September 1997, Plaintiff was diagnosed with a suspected myocardial infarction.

During the time that Plaintiff was managed by Defendant Dizio, he received an officer promotion, with Defendant Dizio's support.

In August 2001, Defendant Churchman became Plaintiff's manager.

---

[*] Plaintiff's Charge is dated December 31, 2002, but refers to events as late as February 14, 2003. Notes in the EEOC Case Log state that before it was filed, the Plaintiff contacted the EEOC on 7 occasions to "change wording in the charge." On May 3, 2003, the EEOC informed Plaintiff of "the urgency in signing his charge and returning it." On May 14, 2003, the charge was received and docketed by the EEOC. MBNA received notice of the Charge on June 23, 2003.

On March 7, 2002, Plaintiff refused to attend a scheduled business meeting, saying his lawyer had directed him not to attend one on one meetings on subjective matters.

On March 7, 2002, Plaintiff left work early, saying he was "being harassed about petty crap."

In May 2002, Defendant Soer became Plaintiff's manager.

In May 2002, Defendant Soer gave Plaintiff his first assignment, preparing a report on quality assurance after first interviewing all of her direct reports, to check on and improve the consistency of practices among the groups reporting to her.

On May 28, 2002, an African-American contract employee, Ava Patrick, complained to Personnel that Plaintiff came up behind her and caressed her around the waist, embarrassing her.

On June 25, 2002, Plaintiff was placed on a First Warning for inappropriate behavior toward Ava Patrick.

On July 8, 2002, Plaintiff asked Defendant Soer if he could modify his arrival time to 8:30-8:45 a.m. and his departure time to 4:30-4:45 p.m. through August 31, in order to accommodate his child care commitments during the summer, and she acquiesced.

 On August 20, 2002, Plaintiff informed Defendant Soer that he would be out of the office on personal business in California on August 29 and 30, 2002.

On August 26, 2002, Plaintiff informed Defendant Soer that he would be in the office on August 29 and 30, but out on September 3 and 4.

Plaintiff and Defendant Soer were scheduled to meet on September 4 to discuss the assignment she had given him in May involving improving quality assurance practices among her direct reports.

On August 26, 2002 Defendant Soer asked Plaintiff to give her a draft of his quality assurance report before he left on vacation.

On September 5, 2002, Plaintiff went out on FMLA/STD leave, being treated for sickle cell anemia, cardiac dysrhythmias and depression.

Plaintiff never turned in his report to Defendant Soer.

On February 18, 2003 Plaintiff was placed on unpaid Placement Assistance, under MBNA's Job Security Policy.

On May 14, 2003, Plaintiff's Charge of Discrimination was received and docketed by the EEOC.

On June 23, 2003, Defendant MBNA received notice of the Charge of Discrimination.

On September 30, 2003, Plaintiff was terminated.

    (4)    **A statement of the issues of fact which any party contends remain to be litigated.**

**<u>Plaintiff's Statement</u>:**

Plaintiff was employed by MBNA America Bank, N.A. beginning June 1996. Plaintiff was hired by Defendant William Christie at salary of Ninety Thousand ($90,000.00) Dollars, as a Vice President for MBNA America Bank, N.A Distribution System Division.

On or about August 1996 Plaintiff was given the responsibility previously held by T. Thomas (white male). Mr. Thomas, who was also a Vice President, was making in excess of One Hundred Ten Thousand ($110,000.00) Dollars. When Plaintiff questioned Defendant Christie about this he was advised that he must prove himself in order to move into that salary range. Around this time, Plaintiff had many successes in his duties.

It should be noted that Plaintiff who was hired to handle Quality Assurance and Testing was given the additional responsibility of Build Management and CMVC Administrator with the same salary of Ninety Thousand ($90,000.00) Dollars.

Plaintiff after having some success with these additional duties was advised in January 1997 that these duties were being assigned to Frank Kramer (white male). Thereafter, Frank Kramer hired Wayne Fountain (white male) as a Vice President at a starting salary of One Hundred Fifteen Thousand ($115,000.00) Dollars, roughly 25% higher than Plaintiff. Plaintiff made attempts to discuss this issue as well as issues relating to pay inequities with Defendant Christie, but such meetings never took place.

Having no success in addressing Plaintiff's issues, Plaintiff in 1998 filed a charge with the Equal Employment Opportunity Commission. The basis of the charge

    

was focused in MBNA America Bank, N.A's Institutional practice of having minorities fill roles of responsibilities equal to their white counterparts but at much lower salaries.

As a result of Plaintiff's filing, Plaintiff received a salary increase and was advised that he in essence should place his trust that MBNA America Bank, N.A would in the future deal with these issues to strive for parity. It should be noted that Plaintiff's complaint had to do in part with Defendant Christie's hiring of a white males at salaries significantly higher than that of the Plaintiff.

In 1998, Plaintiff began to be supervised by Defendant Dave Dizio to work on a program, called Y2K. Plaintiff had various employees working with him, one named Karen Helme. There is no dispute that Karen Helme voiced her displeasure in working for Plaintiff. In fact, Karen Helme and Plaintiff had a verbal exchange and subsequent to such exchange Karen Helme complained to Defendant Dizio. Defendant Dizio conducted his own investigation by reviewing memos of the incident by both Ms. Helme and Plaintiff. Defendant Dizio decided that Karen Helme should be reassigned and that Plaintiff should be reprimanded. Defendant Dizio sent a memo to Defendant Christie stating that plaintiff failed to act properly given his status as a Manager. N o action was taken against Ms. Helme, who was Plaintiff's subordinate. Defendant Christie after receiving such memo admonished Plaintiff. It should be noted that Defendant Dizio admitted in his Deposition testimony that Karen Helme did not want the assignment to work on the Y2K program and had expressed her desire not to be given the assignment prior to her working with the Plaintiff.

Plaintiff while under the supervision of the Defendant Dizio routinely was not included in Management Team meetings. This fact Defendant admitted to at his Deposition. Defendant Dizio deemed that these exclusions were not based on discrimination but Plaintiff's contention is that it was because prior to and during that time, Plaintiff was known to challenge Management on issues relating to pay inequities and job assignments. Management at this point had begun to routinely harass Plaintiff on issues relating to his Management style.

During Plaintiff's tenure with Defendant Dizio, Plaintiff received performance evaluations. In 1999 Plaintiff commented in writing about his performance

evaluation and Defendant Dizio in a memo to Defendants Christie and Smith commented that Plaintiff does not take constructive criticism and that he was quite defensive.

In 2001, Plaintiff began to be supervised by Defendant Churchman. Prior to Defendant Churchman's meeting with Plaintiff, he met with Defendant Dizio. At that meeting instead of discussing issues relating to Plaintiff's experience in Quality Assurance and Testing, Defendant Churchman wanted to know about Plaintiff's personal issues concerning what his peers were saying about him. Subsequently, Plaintiff met with Defendant Churchman. As a result of that meeting on August 13, 2001, Plaintiff prepared a summary of that meeting in an e-mail, and sent a copy to Defendant Churchman and a copy to Defendant Christie. Plaintiff was concerned about the meeting in that Plaintiff believed that Defendant Churchman questioning of Plaintiff was not in any way job related. Plaintiff felt that this was nothing more than Defendants continued act of discrimination, and retaliation and creating a hostile work environment because of his prior complaints regarding job inequities. While Defendant Churchman supervised Plaintiff, Plaintiff was constantly subjected to inquires about timeliness and attendance issues. These issues were the same issues that allegedly other Managers who supervised Plaintiff complained about. Not once did Plaintiff ever get any written warnings from Management on these issues.

Additionally, during this time frame, while Plaintiff was being assigned to various Managers he continued to complain about the discriminatory treatment and pay disparities. Also, during the time Plaintiff was being supervised by Defendant Churchman, Defendant Churchman engaged in unprofessional dialog with co-workers whom either reported to the Plaintiff or who worked with Plaintiff on projects. An example was the comment "Paige being quite a ladies man". This type of comment as well as others similar had a direct effect on the Plaintiff ability to get his peers and him to perform there duties. There were a number of incidents where Plaintiff peers complained to Plaintiff then supervisor about the Plaintiff job performance.

As a continued effort to further harass and retaliate against the Plaintiff, Defendant Churchman prepared a performance evaluation, and in effect stated that Plaintiff was deficient in Testing, even though Defendant Christie, Dizio and Soer all admitted in there depositions that Plaintiff was highly efficient in the area of testing.

Prior to Plaintiff receiving the aforementioned performance evaluation, Plaintiff expressed to Defendant Christie both by e-mail message and in meetings, problems he was having with Defendant Churchman and how it was affecting him professionally.  Plaintiff told Defendant Christie of the various incidents of hostile treatment that he believe to be motivated by race by Defendant Churchman for a period from February 2002 to April 2002 concerning work assignments.  Instead of addressing this issue head on, Defendant Christie had Plaintiff assigned to a new Manager, Defendant Stephanie Soer in May 2002.  Defendant Christie in his testimony testified that plaintiff had issues relating to managers because he always questioned them.  Defendant Christie who admitted that Defendant Churchman should not have made inquiries into Plaintiff's personal life, etc, instead of admonishing said Defendant and having these issues dealt with through Human Resources, just had Plaintiff reassigned to Defendant Soer.  Plaintiff contends that this conduct just allowed the work environment to continue to be hostile towards the Plaintiff.

In May 2002, Plaintiff was given an assignment by Defendant Soer an assignment to prepare a report on Quality Assurance and Testing for the organization. Defendant Soer testified that Plaintiff was given this assignment because she know, based on his work experience that he was proficient in these areas.  Plaintiff admits that during his early tenure with Defendant Soer, that they had meetings regarding his attendance.  At those meetings, Plaintiff expressed his concerns again about the issue because he felt that because of his Management level that he was being overly scrutinized.

In June of 2002, Defendant MBNA America Bank, N.A was informed that Plaintiff was apart of a class action lawsuit regarding MBNA America Bank, N.A discriminating practices.

Plaintiff was subsequently given the assignment to oversee the division picnic.  Plaintiff expressed concern with the assignment to both Defendant Christie and Soer because he felt that his skills were not being utilized because other peer-managers had assignments within this technology sector.

As a result of the years of hostile, abusive and racial treatment, Plaintiff, who had a documented medical history of sickle cell anima, was caused to go out of work for stress.  Plaintiff had begun seeing Dr. Susan Ball in part because of issues relating to

work.  In July 2002, Plaintiff was placed on Family Medical Leave.  Plaintiff went out of work as of September 5, 2002 with a return to work by February 2003.

During Plaintiff's absence, he received a letter from Defendant MBNA America Bank, N.A that his Family Medical Leave was due to expire.  There is a factual issue as to the dates used to calculate his FMLA/STD and when he was to return to work. During the period of Plaintiff's Disability, Plaintiff as required communicated to Defendant Soer and to Jacki Staker of MBNA America Bank, N.A Health and Safety Services that Plaintiff had every intention of returning to his position as of February 3, 2003.  Plaintiff's return to work date was changed to February 18, 2003 because Plaintiff was granted by Defendant Soer additional time.  During that period, Plaintiff received a call from Human Resources that his job security had expired due to the length of Plaintiff's illness and that plaintiff would be placed on "Placement Assistance", which is an unpaid status for six (6) months.  Plaintiff's contention is that this was done in furtherance of MBNA America Bank, N.A and named Defendant(s) discriminating and retaliatory attempts to prevent Plaintiff from returning to his position. Plaintiff maintains the MBNA America Bank, N.A Policy would not have him placed in Placement Assistance but instead should have been in the Sector Placement Program.  The effect of which would have placed Plaintiff in the same division or sector.  Therefore, the Placement Assistance program, an unpaid program, unlike Sector Placement, applies to persons who have been out six (6) to twelve (12) months.

Plaintiff, in May 2003 applied for (after being denied initially), Unemployment Benefits.  Plaintiff had a hearing where it was determined that by placing Plaintiff in the  Placement Assistance program prior to Plaintiff's return to work that the employer had in effect terminated the Plaintiff.  Plaintiff was awarded Unemployment Benefits.  It should be noted that MBNA America Bank, N.A failed to attend the Hearing even though MBNA America Bank, N.A had notice.

After Plaintiff had been wrongfully placed in the Placement Assistance Program, Plaintiff on March 14, 2003 contacted Tamika Sainten, Vice President People Relations, and advised here that since there conversation, when he was called by her and advised of his employment status, that he had not received any job postings, concerning possible jobs at MBNA America Bank, N.A.  The postings that Plaintiff subsequently

received around May and June 2003 were for positions ten (10) levels or lower than Plaintiff's prior position with significantly less money than Plaintiff was earning when he lost his position.  Plaintiff at the time he last worked earned One Hundred Thirty Seven Thousand ($137,000.00) Dollars.

    Subsequently, Plaintiff filed a Charge of Discrimination against MBNA America Bank, N.A and the named Defendant(s) on April 23, 2003 alleging that he was subjected to discrimination and retaliation.

**<u>Defendants' Statement</u>:**

  Did Defendant Dizio exclude Plaintiff from staff meetings?

  If so, was that an adverse employment action?

  If so, is that claim time-barred?

  Did Defendant Churchman reject "Plaintiff's expertise in the testing area?"

  If so, was that an adverse employment action?

  If so, was that claim time-barred?

  Did Defendant Soer refuse to give Plaintiff work assignments that related to his job?

  If so, was that an adverse employment action?

  Was not Defendant Soer's assignment to Plaintiff  to prepare a report on Quality Assurance and Testing for her organization by examining all of her teams' quality assurance procedures and providing her with a report, to be followed by his implementing his recommendations, related to his job?

  Did Plaintiff fail to complete that assignment despite repeated promises that he would do so?

  Did Defendant Soer give Plaintiff the "demeaning assignment of planning the Company picnic for 2002?"

  If so, was that an adverse employment action?

  Had both non-minority and minority male and female officers at and above Smith's level, including Defendant Dizio, been assigned to supervise that team-building project previously?

Did Plaintiff fail to complete that assignment?

Did Defendants circulate rumors about Smith's sex life and a rumor that he had once been a "pimp?"[*]

If so, were those allegations time-barred?

If so, would such actions constitute adverse employment actions?

Was Plaintiff denied promotions or raises in 1999 or 2000 due to his race or in retaliation for protected activity?

If so, were those claims time-barred?

Was Smith subjected to racial harassment?

Was Smith properly notified that his FMLA/STD leave had expired, correctly placed on unpaid leave of absence status with Placement Assistance pursuant to MBNA's Job Security policy, and properly terminated when his Placement Assistance leave expired without Plaintiff having found another position with the bank?

   **(5)**    **A statement of the issues of law which any party contends remain to be litigated.**

<u>**Plaintiff's Statement:**</u>

Plaintiff's claim seeks relief under Title VII of the Civil Rights Act specifically section 42 U.S.C. §2000e-2(a) (1); 2(a) (2); 3(a); and 42 U.S.C.§1981.  Plaintiff contends that the pay disparity as alleged is actionable discrimination under Title VII retaliation. Fierros v. Texas Department of Health, 274 F.3d 187, (5th Cir. 2001).  Part of Plaintiff allegations are that he was denied career opportunities and thus pay increases because of the way he was treated by his managers and because he had been complaining about the

---

[*] *See Knievel v. ESPN*, 393 F.3d 1068, n8 (9th Cir. 2005)(describing the use of the word "pimp" - "today it's a very ambiguous term, used as either a compliment or an insult towards a male.  In its positive form, it means that the person is 'cool.'  In its negative form, it insults their attitudes, clothing or general behavior;" *Accord*, *Troy Group Inc. v. Tilso*, 364 F. Supp. 2d 1149, 1155-56 (C.D. Cal. 2005); *See also*, *Edix Media Group, Inc. v. Mahani*, C.A. No. 2186-N Del. Ch. Dec. 12, 2006)(referring to hobbyists who participate in the after-market car modification industry as "pimping their rides.")

pay inequities.  In Patt v. Family Health Systems, Inc., 280 F.3d 749 (7th Cir. 2002), the Court was faced with the issue of a denial of opportunities after complaining of pay discrimination.  Court held in that case that such a claim may be actionable provided evidence is presented that the employer in there conduct towards the Plaintiff limited her career opportunities.

The law relating to Retaliation is applicable to this case.  In order to prove retaliation one has to prove that they were engage in a protected activity and that they were retaliated against.  Under Burlington, it is no longer required that there be a showing of the employee having suffered an adverse employment action.  In this case the protected activity is the Plaintiff complaint of pay inequities and discriminatory treatment.  Plaintiff was clearly affected by the employer when he was denied the opportunity to return to work and also when he was placed in the program by the Defendant that prevented him from being able to return to his former position.

Compensation and how it is to be applied under Title VII is also relevant on the issues in this case.  Plaintiff contends that the Court needs to look at the absolute amounts of the pay raises for people in similar positions as he where there are allegations that he had been paid less from the beginning of his employment.  Goodwin v. General Motors Corp., 275 F.3d 1005 (10th Cir. 2002).

The law on Continuing Violation Doctrine is applicable to this case.  Generally this is a question for the jury.  As long as there are specific incidents related to Plaintiff's claims of hostile environment that ultimately leads to the present violation then that party can invoke this doctrine.  Moreover, this theory Plaintiff contends apply to Plaintiff claims of Pay Discrimination.  In the case of Cardenas v. Massey, 269 F.3d 251 (3rd Cir. 2001), Court stated Id. at 256 the decision to pay was made on an ongoing basis and citing to Bazemore v. Friday, 478 U.S. 385 (1986), the court held that discrimination in pay is a continuing violation, and the receipt of each check constitutes a new violation.

The law applicable to Back Pay and Front Pay as well as Compensatory Damages for the stress associated with the harassment and lost wages Plaintiff contends to be applicable to this case.

11

**Defendants' Statement:**

**Plaintiff Was Not Subjected To Race Discrimination**

The Plaintiff's claim against MBNA arises under Title VII of the Civil Rights Act of 1964, which states, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1)(1998). His claim against the individual employees arises under 42 U.S.C. §1981 and is parallel to his Title VII claim.[*]

To determine what Plaintiff may properly assert in this case, the Charge of Discrimination and the Complaint should be examined. The specifics of the Charge are that Plaintiff was treated differently "with respect to receiving promotions," was excluded from staff meetings and other communications by Defendant Dizio, had his "expertise in testing matters" rejected by Defendant Churchman, was not given assignments relating to his job by Defendant Soer, had his personal life questioned, was "accused of sexually harassing female co-workers," and was eventually terminated after his leave ran out.

---

[*] "The Court questions whether plaintiff has actually established a *prima facie* case with respect to racial discrimination [under Section 1981]. To establish a *prima facie* case of discriminatory discharge, a plaintiff must prove: (1) that he belongs to a racial minority; (2) that he was qualified for the job he was performing; (3) that he was satisfying the normal requirements in his work; (4) that he was discharged; and (5) that after discharge the employer assigned those who were not members of plaintiff's racial minority to perform the same work. *Flowers v. Crouch Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir. 1977); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 117-18 (3rd Cir.), *cert. denied*, 464 U.S. 937, 78 L. Ed. 2d 314, 104 S. Ct. 348 (1983); *see also Ferguson v. E.I. DuPont de Nemours and Co., Inc.*, 560 F. Supp. 1172, 1192 (D.C. Del. 1983) (similar criteria in context of employment promotions)." *Ohemeng v. Delaware State College*, 676 F. Supp. 65 (D. Del. 1988), n 1.

Plaintiff's Complaint repeats the allegations contained in the Charge, and also says that in 1998, he filed a grievance because of the "racially-biased and hostile atmosphere," Complaint, Par. 19, and after that time, he was denied "professional advancement opportunities" and exposed to a "hostile work environment." Id., Par. 20. Also added is a claim that Plaintiff "was eligible for promotion and salary raises in 1999 and 2000" but Defendants "blocked and sabotaged the Plaintiff's efforts to receive a work promotion." Id., Par. 27. He also says Defendants circulated rumors about his sex life and a rumor that "he had once been a 'pimp.'" Id., Pars. 28-29.

This action is a disparate treatment race discrimination and retaliation case. Disparate treatment cases involve claims of outright discrimination based on a statutorily prohibited characteristic, in this case, race. In a disparate treatment case, the plaintiff must establish that he was treated less favorably, or discriminated against, based on a prohibited characteristic. *See EEOC v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990). In other words, a plaintiff must prove that the decision makers were subjectively motivated by animus against a protected characteristic when the decision in question was made.

In this case, there is absolutely no evidence that race was a factor in any decision associated with the case. Rather Plaintiff's unreliable performance and attendance problems, and the subsequent exhaustion of his leave, were the only factors considered in his treatment and ultimate termination. Whether Plaintiff agrees with the views of the decision makers is beside the point. If they acted in good faith, that is all that is required.

The leading case on what standard an employer taking an employment action must meet is *Cotran v. Rollins Hudig Hall Int'l., Inc.*, 948 P.2d 412 (Cal. Supr. 1998),

where the court reasoned that to require an employer to be "right" about the facts on which it bases its decision is to interfere with the "wide latitude" an employer must have in making "independent, good faith judgments about high-ranking employees without the threat of a jury second-guessing its business judgment."  In that case, involving an allegation of sexual harassment, the court said "the most we can reasonably ask of employers under these difficult circumstances is that they act responsibly and in good faith."  Defendants have done that here.

"A plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination.  Where a plaintiff relies upon his own beliefs and testimony as to his own beliefs from his deposition—and fails to present any factual evidence linking his termination to his membership in a protected class—he has failed to make out a *prima facie* case of discrimination."  *Walsh v. Irvin Stern's Costumes*, No. 05-2515, 2006 U.S. Dist. LEXIS 57398, at *23, n.3 (E.D. Pa. Aug. 15, 2006) (internal citations omitted) (dismissing plaintiff's claims of race discrimination and retaliation because plaintiff could not establish pretext where the only evidence offered by plaintiff that he was treated differently was his own deposition testimony).

### Plaintiff Was Not Subjected to Retaliation

To sustain a claim of retaliation under Title VII,[*] a plaintiff must establish a prima facie case by proving that: (1) plaintiff engaged in protected activity; (2) the employer took adverse employment action against plaintiff; and (3) a causal link exists between

---

[*] There is a current debate as to whether claims of retaliation are even cognizable under 42 U.S.C. §1981.  *Humphries v. CBOCS West, Inc.*,    F.3d    , 2007 WL 60876 (7th Cir. 2007).  *See also*, *Seldon v. Nat'l R.R. Passenger Corp.*, No. 05-4165, 2006 U.S. Dist. LEXIS 67545, at *9, n.2 (E.D. Pa. Sept 20, 2006) (noting that it is "unclear whether the [Burlington] holding should apply to retaliation claims under 42 U.S.C. § 1981."

defendant's employment decision and plaintiff's protected activity. *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1999). If the plaintiff establishes a prima facie case the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's [termination]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996). The plaintiff can then prevail only by refuting the defendant's explanation by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions...." in the defendant's explanation. *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996).

A plaintiff claiming retaliation under Title VII must show "that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore v. City of Phila.*, 461 F.3d 331, at *24 (3d Cir. 2006) (*citing Burlington Northern & Sante Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006)) (internal citations omitted).

Despite Plaintiff's contrary contention, *Burlington* does not affect the present analysis. *Burlington* affected the second element of a p*rima facie* case of retaliation because the plaintiff must show that he suffered a materially adverse action, defined in *Burlington* as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, at 26-27.

 Plaintiff claims he was subjected to adverse actions when he was placed in the unpaid Placement Assistance Program rather than being allowed to remain in the Sector Placement Program (where he would have been assured a job) under the MBNA Job

Security Policy, and also when he was terminated. Termination of employment is, of course, the quintessential adverse action. Being placed in the Placement Assistance Program rather than remaining in the Sector Placement program would also be considered an adverse action under the new *Burlington* standard.

Plaintiff's problem, however, is that he cannot establish a prima facie case of retaliation because he cannot prove the requisite third element—a causal connection between the protected activity and the adverse employment action. *See Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995). "Proof of causation may depend on three types of evidence: temporal proximity, a pattern of antagonism by the employer in response to the protected activity, and the employer's knowledge of that activity." *Walsh v. WalMart Stores, Inc.,* No. 05-3584, 2006 U.S. App. LEXIS 24680, at *6 (3d Cir. Oct. 2, 2006). Evidence of only one of the three elements is generally insufficient to establish a prima facie case. See *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

To establish the third element of the *prima facie* case under *Burlington Northern*, a plaintiff must show a causal connection between his opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Moore v. City of Phila.,* 461 F.3d 331, at *24-25 (3d Cir. 2006).

Smith cannot establish a prima facie case of retaliation because, assuming, *arguendo*, that he engaged in protected activities and was subjected to materially adverse actions, he cannot establish a causal connection between those activities and actions and subsequent events.

> In adducing evidence of causation, the plaintiff may not rely "merely on a post hoc, ergo propter hoc inference from the fact that the restriction was

16

imposed after [she] filed her complaint." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997). "If timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred. *Robinson,* 120 F.3d at 1302; *see, e.g., Jalil* [v. *Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989)] (causal link established where 'discharge followed rapidly, only two days later, upon Avdel's receipt of notice of Jalil's EEOC claim')." *Krouse,* 126 F.3d at 503. On the other hand, "when temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Id.* at 503-04. Evidence of retaliatory animus may be either direct, *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 178-79 (3d Cir. 1997), or indirect, *Robinson v. S.E. Pa. Transp. Auth.,* 982 F.2d 892 (3d Cir. 1993) **[\*16]** (*"SEPTA"*); *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271 (3d Cir. 2000).

*Burton v. MBNA Am. Bank, N.A.*, 2005 U.S. Dist. LEXIS 12154 (D. Del. 2005).

Plaintiff can not establish causation on the basis of temporal proximity. Assuming, *arguendo*, that placement of Plaintiff in the Placement Assistance Program on February 18, 2003 could be construed as an adverse action, the closest protected activity occurred eight months earlier, when, he alleges, Defendant MBNA learned that he was "part of a class action lawsuit" against it.[*]  In fact, Defendants were not aware of any class action lawsuit involving Plaintiff.  Moreover, even if they were, the lengthy time lapse prevents Plaintiff from establishing causation by temporal proximity.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997); *Burton*, *id.; Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)(temporal proximity must be "very close," citing two cases holding that 3 and 4 months was too long).

---

[*] "To qualify as a protected activity, a plaintiff's opposition to an illegal employment practice must raise the issue of discrimination and identify the allegedly discriminatory practice." *Seldon v. Nat'l R.R. Passenger Corp.,* No. 05-4165, 2006 U.S. Dist. LEXIS 67545, at *11 (E.D. Pa. Sept 20, 2006) (internal citations omitted).  "Complaints about 'unfair treatment in general' or expressions of 'dissatisfaction with the fact that someone else was awarded the position' that do not specifically complain of discrimination are not protected activity."  *Id.*, (citing *Barber v. CSX Distr. Servs.,* 68 F.3d 694, 701-02 (3d Cir. 1995))

17

MBNA was not notified of the claims in Plaintiff's Charge of Discrimination until June 23, 2003, after he was already on leave. He had been placed on unpaid Placement Assistance on February 18, 2003. So the only event that occurred after the receipt of notice of the Charge was the termination itself, which simply resulted from a numerical calculation after Plaintiff's six months of Placement Assistance had expired.

In the absence of temporal proximity, causation may be established by a "pattern of antagonism." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (1997). No such pattern exists in this case. Here, during the active portion of the last eighteen months of Plaintiff's employment, he reported directly to Defendant Soer, beginning in May 2002. After the June 2003 class action lawsuit that was filed in Texas in which Plaintiff claims he participated, of which Defendant Soer was not aware, Plaintiff made no internal complaints of statutorily-protected discrimination or engaged in any other protected activity during the time he worked for Defendant Soer. And during that entire period, nothing occurred that was "unusually suggestive" of a retaliatory motive.

Moreover, even if one assumes the actions discussed above would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," Plaintiff can not refute Defendants' articulated legitimate, non-discriminatory reasons for their actions. *See Burnett v. Sch. Dist. of Cheltenham Township*, No. 04-2680, 2006 U.S. Dist. LEXIS 48956, at *36 (E.D. Pa. July 19, 2006). When Plaintiff went on FMLA/STD leave on September 5, 2002, he was treated like any other person in that situation. MBNA continued to pay his salary for six months under its Job Security Policy, and when he delayed his return to work date beyond six months, he was placed on unpaid Placement Assistance, also in accordance with the Job Security Policy. As Plaintiff

stated in his Charge of Discrimination, during the Placement Assistance period, "it would then be my responsibility to do the necessary networking, with some assistance from H.R., to identify a job opportunity within MBNA within the next six months." When he was unable to do so, no doubt in part due to the absence of available jobs at his level during a time when MBNA was facing economic challenges, his employment ended. There is not even a hint of a retaliatory motive in the record.

### Most Of Plaintiff's Claims Are Time-Barred

While it is not clear how far back Plaintiff intends to attempt to reach in his claim, it is readily apparent that much of his claim is barred by the applicable statutes of limitations. For Title VII, discrete events that occurred more than 300 days before his charge was docketed on May 14, 2003, *i.e.* before July 18, 2002, are barred. *Arasteh v. MBNA Am. Bank, N.A.*, 146 F. Supp.2d 476, 490 (D. Del. 2001). For the Section 1981 claim, events that occurred more than four years before suit was filed on December 5, 2005, *i.e.*, before December 6, 2001, are barred. *Riley v. The Delaware River And Bay Authority*, C.A. No. 05-746 (KAJ)(D. Del. October 25, 2006), slip op. at 10-11.

Plaintiff seeks to rely on the continuing violation doctrine, *i.e.,* that the complained of act is part of a continuing practice or pattern of discrimination. *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). But the continuing violation theory does not apply to discrete acts of discrimination like the alleged adverse employment actions that Plaintiff asserts here. *Pullella v. Super Fresh Food Markets, Inc.*, Civ. No. 03-711-SLR, 2004 U.S. Dist. LEXIS 14954, at *30 (D. Del. July 28, 2004); *see also Zdziech v. DaimlerChrysler Corp.*, No. 02-90-GMS, 2003 U.S. Dist. LEXIS 9425, at *6 (D. Del.

June 6, 2003) (holding that placing plaintiff on disability leave and failing to make

subsequent efforts to accommodate him is not a continuing violation).

Plaintiff's reliance on the continuing violation doctrine is misplaced. *See*

*generally*, AMTRAK *v. Morgan,* 536 U.S. 101 (2002).

> *Morgan* established a bright-line distinction between discrete acts, which
> are individually actionable, and acts which are not individually actionable
> but may be aggregated to make out a hostile work environment claim. The
> former must be raised within the applicable limitations period or they will
> not support a lawsuit. Id. at 113 ("Discrete discriminatory acts are not
> actionable if time barred, even when they are related to acts alleged in
> timely filed charges. Each discriminatory act starts a new clock for filing
> charges alleging that act."). The latter can occur at any time so long as
> they are linked in a pattern of actions which continues into the applicable
> limitations period. Id. at 105 ("Consideration of the entire scope of a
> hostile work environment claim, including behavior alleged outside the
> statutory time period, is permissible for purposes of assessing liability, so
> long as any act contributing to that hostile environment takes place within
> [**6] the statutory time period.").

> *Morgan* provides fairly precise guidance as to what sorts of acts are
> "discrete." The Court first observes that "discrete acts such as termination,
> failure to promote, denial of transfer, or refusal to hire are easy to
> identify," id. at 114, then lists the discrete acts in the case before it:
> "Morgan contends that he was wrongfully suspended . . . charged with a
> violation of [a workplace rule], denied training, and falsely accused of
> threatening a manager." Id. (emphasis added).

> We can thus take from *Morgan* the following non-exhaustive list of
> discrete acts for which the limitations period runs from the act:
> termination, failure to promote, denial of transfer, refusal to hire, wrongful
> suspension, wrongful discipline, denial of training, wrongful accusation.

*O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006).*

On pages 12-13, *supra*, the details of the claims Plaintiff made in his Charge of

Discrimination and in his Complaint are set out.  Most of his claims (denial of

promotions and the raises which would have accompanied them, allegedly unfair

criticism of his performance, gossiping about his personal life) are specifically identified

in *Morgan* and its progeny as precisely the kinds of discrete claims that are subject to being time-barred.

The only kind of claim Plaintiff seeks to assert that the Supreme Court exempted from its holding in *Morgan* was what the Plaintiff has called a hostile work environment claim based on racial harassment. But the Supreme Court described that kind of claim as one where "managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." At 120. It is apparent that Smith has made no such claim here. Instead, he has simply alleged that the various discrete acts he relies on should be lumped together as evidence of a racially hostile environment. What he is really saying is that he was "harassed" about his poor performance. That is not the kind of claim to which the Supreme Court was referring. *See*, *Morgan*, at 116 (using the traditional criteria for assessing sexual harassment in determining whether a hostile environment claim based on racial harassment has been established, *viz.*, "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.")

**Plaintiff Can Not Make A Pay Inequity Claim In This Lawsuit.**

Plaintiff's claim of pay inequity, which he now seeks to make but did not assert in either his Charge of Discrimination or his Complaint, is precluded for several reasons. Courts have explained that "[w]here the continuing violation doctrine applies, the illegal practice complained of has materialized or become cognizable as such only over time." *Estrada v. Trager,* 2002 U.S. Dist. LEXIS 17342, *17 (E.D. Pa. Sept. 10, 2002) (*quoted by Zdziech*, 2003 U.S. Dist. LEXIS at *7).  Here, the Plaintiff was already claiming pay inequity in 1998, in an EEOC charge that he later withdrew.  Thus, he can not rely on the rationale discussed in *Morgan*, which, in essence, is that a claim can continue to be asserted when it is not readily apparent at the time it occurs, but only becomes so gradually.  "The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years, and, in direct contrast to discrete acts . . . Such claims are based on the cumulative effect of individual acts." *Morgan*, *id*., at 115.

The Third Circuit and courts within the Circuit have found that the following acts did not give rise to a continuing violation claim:

(1)  Two instances of a failure to hire plaintiff were separately actionable, and thus not a continuing violation**.**  *Shenkan v. Potter*, 71 Fed. Appx. 893 (3d Cir. 2003).  at *6-7.

(2)  Failure to promote and train was not a continuing violation because the promotion of another employee over plaintiff was an individual act that put

plaintiff on notice to assert her rights. *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 483 (3d Cir. 1997).

(3) Failure to promote. *Kovoor v. School Dist. of Phila.,* 211 F. Supp. 2d 614, 622 (E.D. Pa. 2002)

(4) Subjecting plaintiff to mandatory retirement was not a continuing violation despite its present effects. *Courtney v. LaSalle Univ.,* 124 F.3d 499, 505 -6 (3d Cir. 1997).

(5) Placing an employee on disability leave and failing to make subsequent efforts to accommodate that employee is not a continuing violation**.** *Zdziech v. DaimlerChrysler Corp.,* 2003 U.S. Dist. LEXIS 9425 (D.Del. 2003) (*cited by O'Neill v. Best Foods Baking Co.,* No. 02-3663, 2003 U.S. Dist. LEXIS 24675, at *13 (E.D. Pa. Oct. 22, 2003).

Moreover, even if Plaintiff complained of discrimination within the filing period, that did not put his claims within the protections of the continuing violation theory. *O'Neill v. Best Foods Baking Co.,* No. 02-3663, 2003 U.S. Dist. LEXIS 24675, at *16 (E.D. Pa. Oct. 22, 2003).

In *Smith v. Amerada Hess Corporation*, 2005 U.S. Dist. LEXIS 25822 (D. N.J. Oct. 31, 2005), claims of race discrimination and retaliation were made, as in the instant case. The plaintiff claimed that the defendant delayed in hiring her as a full-time employee and also failed to promote her. The court held that the time began running on the delay in hiring claim when plaintiff "became aware of the fact that Defendant engaged in an unlawful delay in hiring," and on the promotion claim "when Plaintiff first claimed of discriminatory treatment in this regard." At *10-*13. In this case, that

awareness of and claim of pay inequity was in 1998, when Smith filed an EEOC Charge of Discrimination complaining that he was being paid less than comparable white employees, a Charge he later withdrew.

The court in the *Amerada Hess* case also held that the plaintiff could not revive her claim by pointing to the fact that a comparable person was receiving a higher salary for the same job at the present time. That "discrepancy in pay . . . is merely the effect of discrimination that occurred outside the limitations period and thus does not revive her time-barred claims (citations omitted). Both the delay in hiring and delay in promoting an employee are discrete events and thus, do not constitute continuing violations . . . " At *15. The Court noted that *Morgan*, *id.*, had "clarified the breadth of the continuing violation doctrine" by holding that it "does not apply to revive untimely discrete acts of discrimination such as 'termination, *failure to promote*, denial of transfer, or *refusal to hire*.'" (emphasis in original).

The most comprehensive treatment of this issue is contained in *Zuurbier v. Medstar Health, Inc.*, 895 A.2d 905 (D.C. App. 2006), a pay disparity case in which the plaintiff, a physician, claimed that "the receipt of even a single paycheck within the limitations period renders the action timely as to all of the earlier paychecks which she received." At 910. The Court discussed *Morgan*, *id.*, observing that there "[t]he Court carefully distinguished, for statute of limitations purposes, between allegations of a 'hostile environment' and claims based on discrete discriminatory acts." At 912. The Court then pointed out that

> Since *Morgan*, several courts have held that allegations of
> prohibited discrimination in the payment of wages or
> salaries are not subject to the continuing violation doctrine.

At 912-913.

Among the cases discussed in *Zuurbier* are *Hildebrandt v. Ill. Dep't of Natural Resources*, 347 F.3d 1014 (7th Cir. 2003), which, relying on *Morgan*, held that each of the plaintiff's paychecks constituted a discrete allegedly discriminatory act and was not part of a single continuing violation, *id.*, at 1028, and *Shea v. Rice*, 409 F.3d 448 (D.C. Cir. 2005), which held that "*Morgan* dooms any hope Shea entertained that his current (and allegedly discriminatory) paychecks can resurrect his otherwise untimely challenges to the paychecks he received [prior to the expiration of the statute of limitations]." *Id.* at 451.

In addition, Plaintiff can not bring a pay equity claim as part of this lawsuit because he did not identify or include any such allegation in the Charge of Discrimination on which this lawsuit is based, nor in the Complaint that initiated the lawsuit. *Antol v. Perry*, 82 F.3d 1291 (3d Cir. 1996)(The test to determine whether the plaintiff failed to exhaust his administrative remedies is whether the acts alleged in the suit are "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." 82 F.3d at 1295 (*quoting Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984)).); *Lewis v. Genuine Parts Co., Inc,* No. 04CF00543GH, 2006 U.S. Dist. LEXIS 11203,  (E.D. Ark. Feb. 27, 2006)(Plaintiff did not mention failure to promote in his first Charge but filed a second Charge one year later and included his promotion claim.  Held, failure to include the promotion claim in the first Charge precludes raising the issue at suit.  Id. at 10-11. The court also held that a disparate pay claim raised by plaintiff for the first time in his suit must also be dismissed for failure to exhaust administrative remedies.  Id. at *12.); Tressel v. Combined Ins. Co. of Am., No. 01-6231, 2003 U.S. Dist. LEXIS 4848 (N.D.

Ill. Mar. 27, 2003)( Dismissing wage claim because it was not raised in the Charge.  Id. at

*19).

> **(6)** **A list of pre-marked exhibits, including designations of interrogatories and answers thereto, requests for admissions and responses, which each party intends to offer at the trial with a specification of those which will be admitted in evidence without objection, those that will be objected to and the Federal Rules of Evidence in support of said objection and the Federal Rule of Evidence relied upon by the proponent of the exhibit.**

**Schedule (6)(a)**
**<u>Plaintiff's Exhibits</u>**

| PX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| 1 | Organizational chart –P42-3 | Objection – FRE 401-402 – 1996 chart and salaries – time-barred | |
| 2 | E-mail messages to Defendant Christie P61-2 | Objection – FRE 401-402 – time-barred | |
| 3 | 1999 Performance Evaluation  D189-197 | | |
| 4 | E-mail messages to Defendant Churchman P82-3 | Objection – FRE 401-402 – time-barred | |
| 5 | 2002 Performance Evaluation  D1019-1026 | | |
| 6 | Disability Statement of Dr. Ball dated 12-10-02  P147 | | |
| 7 | Disability Statement of Dr. Ball dated 1-28-03 P148 | | |
| 8 | Disability Statement of Dr. Ball dated 2-12-03  P149 | | |
| 9 | Medical Records of Dr. Susan Ball P136-151 | | |
| 10 | MBNA Policy for Job Security P104-05; P109-P113 | | |
| 11 | MBNA Short Term Disability Policy P106-109 | | |

DB02:5727726.1                                                                                                                      009626.1045

| PX # | Description | Objection | Response |
|---|---|---|---|
| 12 | Delaware Department of Labor Unemployment Decision dated 5-15-03 P101-103 | Objection - see Defendants' motion in limine | |
| 13 | Plaintiff letter to Tamika Sainten dated March 14, 2003  P127 | | |
| 14 | Plaintiff letter to Tamika Sainten dated June 20, 2003  P6 | | |
| 15 | Handwritten note of Tamika Sainten referred to as bates stamp D1066 | | |
| 16 | Job Postings from MBNA sent to Plaintiff from Tamika Sainten P152-154 | | |
| 17 | Plaintiff's partial 2003 tax return P-17 | | |
| 18 | W-2 statements for 2004 P-18 | | |
| 19 | W-2 statements for 2005 P-19 | | |
| 20 | 2003 Tax Return P-20 | | |

**Schedule (6)(a)**
**Defendants' Exhibits**

| DX # | Description | Objection | Response |
|---|---|---|---|
| 1 | 1998 Appraisal, Smith's requested changes (D135-137) and Dizio memo declining to make changes | | |
| 2 | 4/20/98 Medical report from Dr. Keogh re Plaintiff's multiple medical problems (D115) | | |

27

| DX # | Description | Objection | Response |
|---|---|---|---|
| 3 | Memo from Plaintiff to Personnel re Theresa Nolan incident and handwritten notes in response – D203-4; D15 | | |
| 4 | Memos re Karen Helme incident – D163-167; D172; D175-179 | | |
| 5 | D451-2; D462 – Plaintiff's memo to Churchman and response as he begins reporting to her | | |
| 6 | D443-44 – Memos re Plaintiff's failure to meet deliverable date and availability problems | | |
| 7 | D483 – Churchman note re Plaintiff's slowness in turning in review | | |
| 8 | D491-2 – Christie Memo re meeting with Plaintiff and Response from Personnel | | |
| 9 | D500-501 – Plaintiff's memo re problems with Sonya Giannone; D525-6; D532-33 – Memos re Plaintiff's problems managing Marie McKee, and Defendant Churchman's effort to assist; D564-5 | | |
| 10 | D534 – Churchman memo to Plaintiff re missed meetings | | |
| 11 | D543 – Plaintiff's request to move his office away from those he manages | | |
| 12 | D567-569; D603; D605-06; D594 – memos re pending issues and meeting with Personnel on them | | |

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| 13 | D604 – Churchman arranges for Plaintiff's enrollment in a class on Officer Expectations | | |
| 14 | D586-8 – Churchman notes re Plaintiff's performance review | | |
| 15 | D674; D678 – Churchman memos re complaint from Carole Evans about Plaintiff failing to meet deliverables and creating difficult working relationship | | |
| 16 | D675 – Memo re Plaintiff almost missing important meeting | | |
| 17 | D679; D680 – Churchman and Christie express concerns to Personnel about Plaintiff's issues resurfacing, and Churchman memo to Smith re various performance issues with him | | |
| 18 | D693 – Churchman memo re Plaintiff failing to attend quarterly division meeting | | |
| 19 | D698; D1231-2; D703-4; D720– Memos and documents re Plaintiff's failure to attend meeting, his claim that his lawyer instructed him not to attend, and walking out in middle of day, expressing annoyance | | |
| 20 | D703-4; D731-2; D736 – memos re attendance at meetings, Draft Corrective Action Report and note that it was not administered | | |

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| 21 | D708; D709; D721 – memos re Plaintiff being out on STD starting 3/8/02 until 3/25/02 | | |
| 22 | D735; D737 – Churchman memo re Plaintiff's return to work and memo re discussion with Plaintiff about his career and changing positions | | |
| 23 | D744; D750; D751 – Churchman memo re Plaintiff's poor performance and delays in connection with status reports; Memos re complaints about Plaintiff from 5-10 other employees, and the fact that Plaintiff has not been disciplined for engaging in conduct for which others have been reprimanded | | |
| 24 | D754 – Churchman memo re Plaintiff moving to another area | | |
| 25 | D756-7; D766-7 – Plaintiff's memo complaining that Churchman is harassing him, Churchman's response, and Defendant Christie's memo to Personnel on the issue | | |
| 26 | D772-D779 - Sainten memo of 5/20/02 summarizing Plaintiff's history of problems | | |

009626.1045

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| 27 | D797-8; D1238-40; D860 – Ava Patrick complaint about Plaintiff to Personnel, Corrective Action followup, and Plaintiff's response memo | | |
| 28 | D813-816; D890; D893 – Plaintiff's 2002 mid-year review and his responses | | |
| 29 | D840; D846 – Memos re July Division meeting | | |
| 30 | D863 – Plaintiff's request for change in reporting time and ending time of work day due to child care commitments for the summer months | | |
| 31 | D878; D905; D952; D1012 – memos re Plaintiff's Testing Process Assignment and thanking Soer for allowing Smith to take "impromptu" vacation by rescheduling a followup meeting | | |
| 32 | D6684-D6687 – Memos re time and attendance issues | | |
| 33 | D1252; D1255 – Plaintiff on FMLA leave beginning 9/5/02 | | |
| 34 | D1019-D1026 – Draft of Plaintiff's year-end review, prepared by Defendant Soer | | |
| 35 | D1045-1046 – Job Security Policy, #216; D1174-D1180 – Short-Term Disability Policy, #502; D1182-D1186 – FMLA Policy, #505; D10 – Summary of STD and Job Security Policies | | |

31

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| 40 | D1188-9 – Disability Certificate saying Plaintiff's return to work date is 2/2/03 | | |
| 41 | D1032 – Sainten memo re Plaintiff's job security benefits | | |
| 42 | D1033; D1034; D1035 – Memos to Personnel and letter to Plaintiff stating that Plaintiff's FMLA leave expired on 11/27/02 and would renew on 9/6/03 | | |
| 43 | D1037 – Letter to Plaintiff that STD benefits are approved until 1/20/03, after which pay will be discontinued | | |
| 44 | D1047-1049; D1066 – Personnel notes re Plaintiff's status, and noting that STD benefits were extended to 2/18/03 | | |
| 45 | D1059-D1063 – Health Services Nurses' Notes | | |
| 46 | D1193-D1198 – Certified letter advising of Long Term Disability benefits and Job Security and Pay Status | | |
| 47 | D1203 – Dr. Ball's Disability Certificate of 1/28/03 with 2/2/03 Return to Work date | | |
| 48 | P150; D1205 – Memo to Dr. Ball from Dr. Soojian re return to work date, Dr. Ball's 2/12/03 Disability Certificate changing return to work date to 2/18/03 | | |

DB02:5727726.1                                                                        009626.1045

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| 49 | D1071 – Personnel Change placing Plaintiff on unpaid placement assistance as of 2/18/03 | | |
| 50 | P151 – Dr. Ball's progress note of 2/19/03 | | |
| 51 | D1077; D1078 – Sainten letter to Plaintiff enclosing Job Security policy and memo re phone call with Plaintiff discussing job security policy | | |
| 52 | D1085-6; D1293-4; D1119; D1141-2 – Personnel memos, letters and notes re Plaintiff's status during Placement Assistance period | | |
| 53 | D1259 – 9/30/03 letter to Plaintiff advising that his period of placement assistance ended on 8/18/03 and his employment was terminated as of 9/30/03. | | |
| 54 | P20 – Plaintiff awarded Social Security Disability benefits, finding that his disability began on 9/6/02. | | |
| 59 | D6439-D6441 EEOC Case Log | | |
| 60 | Expert Economist's Report | | |

Defendants reserve the right to use any exhibits identified by Plaintiff.

**Schedule (6)(b)**
**Plaintiff's Demonstrative Evidence**

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| A | | | |
| B | | | |

009626.1045

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| C | | | |
| D | | | |
| E | | | |

**Schedule (6)(b)**
**Defendants' Demonstrative Evidence**

| DX # | Description | Objection | Response |
|------|-------------|-----------|----------|
| A | Courtboard or PowerPoint slide – Key Players | | |
| B | Courtboard or PowerPoint slide – Chronology of Events | | |
| C | Courtboard or PowerPoint slide – Calendar Showing Plaintiff's Absence History | | |
| D | Courtboard or PowerPoint slide – Blow-Up of Admitted Exhibits | | |
| E | Any other courtboards or PowerPoint slides | | |

(7)     **The names of all witnesses a party intends to call to testify either in person or by deposition at the trial and the specialties of experts to be called as witnesses.**

**Plaintiff's Witnesses:**

| Witness | Objection | Response |
|---------|-----------|----------|
| Plaintiff Russell Paige Smith | | |
| Stacey Jones-Housley | | |
| William Christie | | |
| Dave Dizio | | |
| Johnni Churchman | | |
| Stephanie Soer | | |
| Tamika Sainten of MBNA | | |

| | | |
|---|---|---|
| Dr. Susan Ball | Objection to the extent she is being offered as an expert since she was not identified as such – FRE 701 | |

**Defendants' Witnesses:**

| Witness | Objection | Response |
|---|---|---|
| William Christie | | |
| Jonni Churchman | | |
| David Dizio | | |
| Stephanie Soer | | |
| Tamika Sainten | | |
| Brian P. Sullivan, Ph.D., Expert Economist | | |

Defendants reserve the right to call any witnesses identified by Plaintiff.

> **(8)     A brief statement of what Plaintiff intends to prove in support of Plaintiff's claims including the details of the damages claimed, or of other relief sought, as of the date of preparation of the draft order.**

With regard to the Plaintiff claims given that Plaintiff was a long-term employee with the Defendant and there is sufficient documentation regarding Plaintiff claim regarding the pay inequities we believe prima facie case of discrimination can be made when Plaintiff is compared to his peers (white males) and there salaries. As far as plaintiff claims of discrimination including hostile work environment, disparate treatment, and retaliation the evidence developed so far we contend will also survive any challenge of dismissal.

Plaintiff contention is that all of his claims have been preserved. The claims alleged by the Plaintiff and filed with the EEOC date back to at least one year prior to his filing of his charge in December 2003. Plaintiff 1981 claims and whether or not these claims are pursuable are at issue. Plaintiff believes that the Defendant will argue that

these claims should have been placed in suit by February 2005. Plaintiff will argue that the Continuing Violation theory would be applicable.

There is no question that the discovery taken thus far shows that the Plaintiff had a propensity to document his feelings regarding his work and any issues that he felt to be unfair. Management will say that he was arrogant, confrontational and condescending in his manner of communicating. They will say that he had a problem with his attendance. That he also had performance problems had poor supervision skills and an inability to get along with his subordinates. Plaintiff view is that these attributes were given to him by his managers all of whom was white and that because he was so much talked about these attributes became common place to the point where it affected him. Plaintiff admits that he did have some issues with attendance but he felt it was much discussed unfairly as to him. Plaintiff admits that he did have problems with his managers and his subordinates but that the problems centered on his work and what was expected by him and to him from those who reported to him. Throughout Plaintiff employment with the exception of maybe two times plaintiff received good evaluations. Also Plaintiff was not given any notice that because of these issues he was in jeopardy of getting some type of discipline.

We expect that the employer will state that even though Plaintiff had concerns about pay discrimination and working in a hostile environment and retaliation that he was paid a lot of money and because of his personality he was the cause of his problems.

On the issue of his being placed in the Placement Assistance program as oppose to the Sector Placement, and his not being permitted to return to work, even though the employer knew his intentions was to return to work, we contend that this conduct clearly was retaliatory. The policy relating to FMLA and STD was not followed. Plaintiff contention is that they wanted to rid themselves of the Plaintiff and used the policy in effect to cause Plaintiff to in essence become discharged. Defendants contention is that there calculations was correct even though to date there is no direct evidence to support that proposition.

Because of Plaintiff's having filed a prior EEOC complaint and his participation in a Class Action centered around issues of pay inequities, promotional issues, and discrimination and because most of these named Defendants were there and had

knowledge of this Plaintiff contention is that he was a marked man and that all of the harassment stemmed from those protected activities.

Plaintiff at the time of his separation from employment at MBNA earned $136,782.00 as a base salary. In February 2003 Plaintiff was placed on unpaid leave status and was eventually terminated. Plaintiff earned approximately 38,000.00 that year. Plaintiff did get social security disability for a period of time beginning July 2003. During the period from the date Plaintiff was placed on unpaid leave and while Plaintiff was collecting disability Plaintiff was looking for work. Plaintiff had jobs, started and stopped his own company and eventually got a job in 2005 with Comcast where his earnings were 85,856. Plaintiff is seeking a back pay award from the period of his being placed on unpaid leave to the time he got the job at Comcast minus any income earned during that period. Additional back pay losses to include any out a pocket expenses for medicals, pension benefits and or profit sharing and loss of bonus. Additionally, Plaintiff is claiming that he suffered a pay inequity with comparable white employees and is seeking damages for the differences in salaries of other managers who during the relevant period earned salaries at a higher rate then the Plaintiff.

Plaintiff is also seeking damages for retaliation for the treatment that he received from the named defendants because of his participation in protected activities under Title VII.

**(9)      A brief statement of what the Defendants intend to prove as a defense.**

The evidence in this case will show that Plaintiff has a very large ego and an unduly inflated opinion of his performance and accomplishments while at MBNA. Because he has viewed everything through his own warped prism during the time of his employment at MBNA, he has reacted to any criticism of his performance by looking for excuses rather than accepting responsibility and attempting to improve. He was given far more leeway and second chances than he deserved, and ultimately, was properly terminated after exhausting all of his paid and unpaid leave time under MBNA's Job

Security Policy.

Smith, who is African-American, was hired by Defendant Christie, acting on behalf of MBNA, on June 24, 1996. Smith's expertise was in quality assurance and testing. Smith was hired into MBNA's Technology sector as a Vice President at a salary of $90,000. Defendant Christie paid Smith a starting salary $10,000 higher than Smith had requested when he applied for the job, and gave him a $12,000 signing bonus. Smith began as a Team Leader in the Distributed Systems Support Department.

Smith was afflicted with sickle cell anemia and at one point, in 1997, also suffered a heart ailment and later, psychiatric problems. From the early stages of his employment, he was absent repeatedly, usually on short term disability leave. He also arrived late for work frequently, disappeared during the work day for hours at a time, and failed to respond to his managers' pages, much to their frustration. While Smith's attendance problems were noted by each of his managers, the problems became more acute toward the latter part of his employment.

In 1998, Plaintiff filed a charge of discrimination, claming that he was not paid as much as similarly situated white employees and was told he "would have to prove myself to move into that salary range" In fact the employees with whom he compared himself were far more experienced, and had earned more in their previous jobs. Plaintiff's salary in 1999 was the 9th highest of the 19 Vice Presidents reporting to Defendant Christie, and was in the top twenty-percent of all MBNA Vice Presidents. Plaintiff withdrew his charge of discrimination after this information was given to him.[*]

---

[*] In 2001, there were three comparable people in his department who were paid more, and five who were paid less.

Although intelligent and articulate, Smith gained a reputation at MBNA as an unreliable performer and an abrasive manager. He was repeatedly involved in altercations with other employees, usually female employees to whom he either was overly demanding and condescending, or with whom he became unduly friendly.

In 1998-99, his immediate manager was Defendant Dizio. Smith, who, to put it mildly, was not receptive to constructive criticism, wanted Dizio to change much of the wording on his 1998 year-end evaluation. Dizio refused, saying Smith was trying to distort the record and was always defensive, a pattern that continued throughout Smith's employment.

During the late 1990s and 2000, Smith worked on the bank's Y2K project and received good reviews from Dizio for his contribution. Primarily due to that work, he was promoted to First Vice President on or about June 13, 2001. Defendant Dizio actively supported that promotion.

However, Smith continued to have problems managing personnel and getting along with co-workers throughout this period and afterwards. In mid-1999, for example, he claimed that a white female employee named Theresa Nolan was "harassing" him. Ms. Nolan had told some fellow employees that Smith had asked her out and that she and Smith had a romantic relationship. Smith insisted that Nolan be dismissed for "gossiping." When the Personnel Department conducted an investigation of the matter, he accused them of engaging in a "witch hunt" against him. Smith had requested that "HR ask Ms. Nolan to discontinue her allegations of a personal relationship between she and I (sic), **as none exists**. (emphasis added)." Smith also claimed "Ms. Nolan and I were casual acquaintances at best." At his deposition in this case, Smith for the first time

admitted that he had, in fact, had a sexual relationship with Ms. Nolan and had gone out with her two or three times.

In early 1999, a white female employee named Karen Helme, who had been assigned to work with him on a project, complained about her treatment by Smith, who in turn claimed she had been insubordinate to him. An investigation ensued, and Smith admitted they had argued and that he had raised his voice and told her to "get the f… out of my office." Defendant Dizio, who conducted the investigation, concluded that Ms. Helme's version of what had occurred was more credible than Smith's, and Smith was told that, as an officer, he should not have lost control of himself. Nevertheless, Helme was reassigned and Plaintiff was allowed to remain in his position.

In August 2001, Defendant Churchman became Plaintiff's Manager. In October 2001, Sonya Giannone and Marie McKee, two employees who reported directly to Smith, complained that he did not attend meetings that he was supposed to attend and was hostile in his communications to them. Characteristically, he responded by accusing them of insubordination and later refused to "further manage the resource [his phrase for one of the employees]." He subsequently charged one of the employees with "racism." When a Personnel representative, Tamika Sainten, an African-American female, sought to investigate the racism charge and asked him to elaborate, he declined to do so. In another attempt to placate Smith, the two employees were transferred.

Defendant Churchman was a more traditional manager than some others at MBNA, and as such, she documented closely Smith's failure to come to work on time, failure to show up for scheduled meetings, and failure to complete his projects. In February 2002, she told him she was spending far too much time keeping track of his

projects and interceding with his testing counterparts in Dallas, Texas, with whom he did not get along. She directed him to do his work and stop arguing about it.

The next week, Smith had car trouble and missed a 10 o'clock quarterly division meeting. A few days later, Smith walked out of the bank early, saying he was "being harassed about petty crap," such as not attending meetings in person and arriving a few minutes late. He said he had retained a lawyer and the lawyer had instructed him not to attend one on one meetings on "subjective" matters. Three days later, Smith missed an important meeting where he was scheduled to speak. There was an internal discussion of taking corrective action at that time, but it was decided that no discipline would be meted out.

Smith then asked to be transferred. Defendant Christie offered him a testing assignment, but Smith expressed a lack of interest in it and asked to move elsewhere. Smith specifically asked Defendant Christie whether the Quality Assurance Division had any openings. Christie contacted the Director of Quality Assurance, James Thornton, an African-American, but he was unwilling to take Smith into his organization.

In May 2002, Smith was reassigned by Christie to Defendant Soer, the Director of Distributed Systems. Christie decided on that assignment because Soer had not been with the bank for very long and had not formed a negative impression of Smith. When Smith met with Soer, she told him she envisioned that his new position would take advantage of his testing and quality assurance background. She wanted him to assess and evaluate the performance of the areas that reported to her, and provide improvement recommendations to her senior managers.

Within days after Smith began reporting to Defendant Soer, a complaint about him was submitted by an African-American contract employee, Ava Patrick, who said that Smith had come up behind her and wrapped his arms around her waist. An investigation was conducted, and Smith explained his conduct by saying he "thought they had a cool relationship." He apologized to Ms. Patrick and was given a First Warning for inappropriate behavior.

As was his typical modus operandi, Smith then asserted that Ms. Patrick was "gossiping" about him and insisted that she be dismissed. Encouraged by Smith, another contract employee came forward and accused Ms. Patrick of spreading a rumor that Smith and a friend of hers were expecting a child. Ultimately, in an attempt to end the discussions about the Patrick complaint and Smith's personal life, MBNA ended the assignments of both contractors.

As stated above, shortly after Smith was reassigned to her, Defendant Soer had given Smith the job of examining all of her teams' quality assurance procedures and providing her with a report, which was to be followed by his implementing his recommendations. Her purpose was to establish a level of consistency among her teams, utilizing the best practices that Smith identified.

While Smith professed to be an expert on quality assurance, and even though Smith claimed that for someone with his level of experience it would take him two weeks "at the max" to complete the report, he never satisfactorily completed even the first part of that assignment. He was supposed to turn in his preliminary report on June 6, after which he was to have implemented his recommendations. He took a vacation day on June 6. He did not hand in a first draft of the report for several months thereafter.

Soer also assigned Smith a secondary job, planning the annual team-building event for the teams that reported to her, comprising about 400 people.  Initially, Smith balked, claiming the assignment was beneath him, even though other persons at his level and above, both male and female, white and black, had done the same job previously.  He "reluctantly" agreed to take on the assignment, but left Soer in the lurch and did not complete it.  She had to stay up until midnight the day before the event, in order to complete the plans for it.

On July 8, 2002, Smith asked Soer for a modified work schedule through August 2002, and she granted his request.  In order to accommodate his claimed child care commitments, he was allowed to arrive between 8:30 and 8:45 and leave at 5:30 to 5:45.  However, Smith would frequently arrive after the agreed on start time of 8:45.  Soer also had trouble locating Smith when he was at work.  Soer's other direct reports would usually respond to her pages within a few minutes while Smith often would not respond at all.  He also ignored Soer's instructions to contact her directly if he was going to be late.  Instead he would call a secretary and leave a message.

0n August 9, 2002, Plaintiff turned in a slapdash, generic preliminary report on the quality assurance assigment he had been given by Defendant Soer in May.  Soer was not pleased, and gave the report back, explaining that she had expected and wanted a more in-depth and thorough analysis of each area that reported to her.

Soer and Plaintiff were scheduled to meet and review his revised report on September 4, 2002.  Plaintiff suddenly decided to take a vacation in early September, and on August 30, he sent Defendant Soer a memo thanking her for accommodating his "impromptu vacation request" and asking her if she wanted his report before he departed

43

for vacation. He told her it was "my continued goal to demonstrate to you that, regardless of perception, Paige Smith is the consumate (sic) performance focused manager and leader . . ." Soer told Smith to leave the completed report on her desk before he departed for vacation, so that she could review it and meet with him when he returned. Plaintiff never turned in the report.

After taking his vacation, Smith immediately went out on short term disability leave on September 5, 2002 and never returned to work. Eventually, his paid leave ran out and for a period of time, he was on what was called "Placement Assistance" under the MBNA Job Security Policy. He was terminated on September 30, 2003 when his unpaid Placement Assistance ended without his being able to find another position at the bank. Plaintiff claims, erroneously, that MBNA should have allowed him more time under its policy. In fact, the policy was applied to him in the same fashion that it was applied to all others.

Plaintiff later applied for and received Social Security Disability benefits, and was determined by the Social Security Administration to have been disabled as of September 6, 2002. Despite that determination of disability, Smith established a consulting technology business beginning in 2003, but the business failed in 2004. From April through October 2005, Smith was employed by Comcast, receiving the same approximate salary and benefits as he had earned at MBNA, as well as a $30,000 signing bonus. Smith voluntarily quit that job in October 2005, supposedly in order to restart his consulting business. Defendants have filed a motion in limine contending that Plaintiff is not entitled to claim either back or front pay since, for multiple reasons, he has failed to mitigate his damages.

The record shows that Smith was treated with extraordinary fairness throughout his employment.  Hired as a Vice President and given a higher salary than he had requested, he received a grade promotion to Team Manager II in 1998, a tier promotion to Section Manager H in 1999, and an officer promotion to First Vice President and Senior Project Adviser I in 2000.  He also received merit increases and bonuses.  He was periodically assigned increasing job responsibilities commensurate with his job grade and officer level progression.  When he asked for reassignments, he was given new opportunities, but the same deficiencies persisted.  Ultimately, after using up all of his paid and unpaid leave, he was terminated in accordance with bank policy.  There was no race discrimination or retaliation involved.

    **(10)** **Statements by counterclaimants or cross-claimants comparable to that required of Plaintiff.**

This is not applicable because Defendants have not brought any counterclaims or cross-claims.

    **(11)** **Any amendments to the pleadings desired by any party with a statement whether it is unopposed or objected to, and if objected to, the grounds therefor.**

None

    **(12)** **The parties certify that two-way communication has occurred between persons having authority in a good faith effort to explore the resolution of the controversy by settlement but those efforts were unsuccessful**.

**Plaintiff's Statement:**  Plaintiff shortly after filing the lawsuit had some preliminary discussions regarding  Settlement.  Plaintiff submitted a written demand in March 2006 of $550,000.00.  Plaintiff was out of work for approximately 26 months. At the time of

his termination his earnings with bonuses was about $148.000.00. When the demand was submitted plaintiff counsel advised the Defendant that there was room to negotiate. Plaintiff remains open to resolution and had expressed that to Defense counsel.

**Defendants' Statement:**  The parties have participated in a mediation with Magistrate Judge Mary Pat Thynge but have not been able to resolve this case.

> **(13)    Any other matters which the parties deem appropriate, including whether or not the trial should be bifurcated.**

Defendants further reserve the right, pursuant to the Guidelines for Civil Trials Before Judge Robinson, to take a trial deposition of any witnesses not previously deposed.

> **(14)    Limitations, Reservations and Other Matters**

Not applicable.

### TRIAL TIME ESTIMATES

> **A.    Length of Trial.**    Three days.

Mark appropriate box:         Jury                    _____

                              Non-Jury        ___X___

IT IS ORDERED that this Final Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown. Such modification may be made either on application of counsel for the parties or on motion of the Court.

DATED: _____

_____
Chief Judge Sue L. Robinson

Approved as to form and substance:

DOROSHOW, PASQUALE, KRAWITZ, SIEGEL & BHAYA

*/s/ Matthew R. Fogg*

Matthew R. Fogg, Esquire  (No. 2440)
1202 Kirkwood Highway
Wilmington, DE  19805
Telephone:  (302) 998-0100
Facsimile:  (302) 998-9114
Email:  mattfogg@dplaw.com
Attorneys for Plaintiff

Dated: February 16, 2007

LAW OFFICES OF ADRIAN J. MOODY, P.C.

*/s/ Adrian J. Moody*

Adrian J. Moody, Esquire
Stacy L. Shields, Esquire
1616 Walnut Street, Suite 700
Philadelphia, PA 19103
Telephone:  (215) 735-2400
Attorneys for Plaintiff

Dated: February 16, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sheldon N. Sandler*

Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391, Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673, 571-5008
Facsimile: (302) 576-3330, 576-3476
Email:  ssandler@ycst.com, mdibianca@ycst.com
Attorneys for Defendants

Dated: February 16, 2007